UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARGIE J. WINN**,                                      Case Number 5:11 CV 2798

      Plaintiff,                                      Judge James S. Gwin

      v.                                             REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

      Defendant.                                      Magistrate Judge James R. Knepp II

### Introduction

Plaintiff Margie J. Winn filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### Procedural Background

Plaintiff filed applications for DIB and SSI, alleging disability since May 1, 2009. (Tr. 154, 161).  Plaintiff alleges she is disabled due to lower back and left leg pain related to spondylolisthesis, and migraine headaches. (Tr. 12, 30-31, 175). Plaintiff's claims were denied initially (Tr. 117, 121) and on reconsideration (Tr. 129, 136). Plaintiff requested a hearing before an administrative law judge (ALJ). (Tr. 93). After a hearing, where Plaintiff, her attorney, and a vocational expert (VE) appeared, the ALJ denied Plaintiff's claims. (Tr. 7-18, 24-62). The ALJ found Plaintiff had severe impairments but she was capable of performing past relevant work as a

cashier or bill collector. (Tr. 13, 18). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981; 416.1455, 416.1481. On December 28, 2011, Plaintiff filed the instant case. (Doc. 1).

## Background

Plaintiff's disability claim centers on complaints of severe lower left back pain, which shoots down her left leg causing numbness and tingling. (Tr. 175, 200). Plaintiff claims this pain precludes her from standing, sitting, or walking for long periods of time, thus rendering her disabled. (Tr. 175, 200). At the time of the ALJ hearing, Plaintiff was 33 years old, married, and a mother to three children, aged two, three, and 13. (Doc. 13, at 2); (Tr. 45).

### *Medical Treatment History*

On June 10, 2009, Plaintiff presented to Dr. Williams at the Aultman Health Foundation for pain management at the request of her primary care physician, Dr. Penvose. (Tr. 241). Plaintiff reported she fractured her L5 vertebra in 1993, but did not undergo surgery. (Tr. 241). Plaintiff reported experiencing severe lower back pain, which became worse when she lifted her children or spent extended time on her feet. (Tr. 241). Plaintiff reported her symptoms improved with the use of a heating pad but prescribed pain medication made her drowsy. (Tr. 241). Plaintiff also reported foot pain, described as painful at rest and worse during weight bearing activity. (Tr. 241). Plaintiff stated these symptoms do not alter her activities of daily living (ADLs), because she must keep going for her family. (Tr. 241). On examination, Plaintiff demonstrated full muscle strength and range of motion in her upper and lower extremities, with no tenderness or laxity. (Tr. 242). Plaintiff's gait was also intact, despite being diagnosed with chronic lower back pain (likely mechanical), bilateral dorsal foot pain with weight bearing, bilateral pes planus, and a stabilized

2

blood disorder. (Tr. 242).

A set of x-rays ordered by Dr. Williams the same day revealed grade two spodylolisthesis of L5 on S1, with probable bilateral L5 spodylolisthesis, and prominent narrowing of the L5-S1 disc space. (Tr. 233). An x-ray of the sacroiliac joints revealed no abnormalities (Tr. 234) and x-rays of Plaintiff's feet revealed no acute abnormalities, bones intact, and joints maintained, but pes planus evident on the left foot (Tr. 235). During a follow up on June 30, 2009, Dr. Williams suggested physical therapy, weight loss, and a neurosurgery consultation for her lower back because Plaintiff reported she was not responding to conservative measures. (Tr. 240).

On July 15, 2009, Plaintiff presented to Dr. Berke for the recommended neurosurgery consultation. (Tr. 250). Plaintiff reported her lower back and leg pain were aggravated by physical activity, but she denied weakness, atrophy, or fasciculation. (Tr. 250). On examination, Plaintiff had full muscle strength, normal tone, normal cranial nerves, normal gait, normal sensory exams, and normal coordination testing. (Tr. 250). Plaintiff did have sensory loss in the left L5 distribution, but was able to perform tandem toe and heel walk with a normal gait despite a positive straight leg raise. (Tr. 250).

Dr. Berke diagnosed Plaintiff with lumbosacral radiculopathy in the L5 region and excessive daytime sleepiness, probable sleep apnea. (Tr. 250). Dr. Berke recommended an electromyographic (EMG) study for Plaintiff's left lower back and leg, which subsequently came back normal. (Tr. 251-52). Notably, Plaintiff filled out a symptom report prior to her EMG and reported no issues with walking or balance and no joint pain. (Tr. 258). Plaintiff also reported no trouble living independently and denied using a cane, walker, or wheelchair, but reported trouble performing household chores. (Tr. 260).

On December 23, 2009, Plaintiff presented to Dr. Felden for epidural injections, at which time it was noted that Plaintiff's pain was resolving. (Tr. 278). Plaintiff described her pain as a three on a scale of ten, despite numbness in her left leg. (Tr. 278). Plaintiff also reported she was able to partake in more activities since her last visit, including walking, standing, washing dishes, and shopping. (Tr. 278). Dr. Felden noted Plaintiff's L5-SI spondylolisthesis and left lower extremity radiculopathy. (Tr. 279).

MRIs and x-rays taken October 19, 2009 and March 12, 2010 confirmed spodylosis and disc space narrowing in the L5-S1 region but were otherwise unremarkable. (Tr. 271, 274, 304). In addition, x-rays of Plaintiff's sacroiliac joints revealed the presence of a benign bone island on the right side but were otherwise normal. (Tr. 273).

On September 24, 2009, Plaintiff's treating physician Dr. Penvose filled out a disability questionnaire. (Tr. 265). Dr. Penvose began treating Plaintiff in November 2002 and noted Plaintiff's symptoms of back and leg pain, which affected her ability to care for her children and stand for long periods of time. (Tr. 266). Dr. Penvose described some decreased range of motion, but intact deep tendon reflexes and no motor loss. (Tr. 266).

As Plaintiff points out, most of Dr. Penvose's records are illegible. (Doc. 15, at 5). However, they reflect Plaintiff suffered from "back pain" that radiated to Plaintiff's left leg, resulting in decreased range of motion. (Tr. 290-92). And while Dr. Penvose diagnosed Plaintiff with deep venous thrombosis (DVT) (Tr. 289), a subsequent lower venous study revealed Plaintiff did not have DVT but rather superficial venous thrombosis in her right calf. (Tr. 299). An additional lower venous study of Plaintiff's left leg revealed no abnormalities, no DVT, and no superficial venous thrombosis. (Tr. 308). Inactive thrombosis was confirmed by Dr. Rooney throughout 2010. (Tr. 389-

4

94).

On September 8, 2010, Dr. Weiner wrote a letter to Dr. Penvose stating Plaintiff would "probably" benefit from surgery to relieve her spondylolisthesis. (Tr. 359). When Plaintiff returned to Dr. Penvose on September 19, 2010, he merely diagnosed Plaintiff with "back pain". (Tr. 356).

Plaintiff sought treatment with Dr. Ehrler at the Crystal Clinic three different times in September and October 2009, and January 2010, respectively. (Tr. 362-66). Plaintiff was diagnosed with spondylolisthesis; however, each examination revealed Plaintiff had normal strength and range of motion in her hips, knees, and ankles. (Tr. 362-66). During Plaintiff's final examination, it was noted epidural injections helped relieve her symptoms and Plaintiff stated she felt good and had no pain in her back. (Tr. 362). In January 2010, Plaintiff also presented to Dr. Rooney for a controlled blood disorder. (Tr. 390). Despite all the evidence up to this point concluding Plaintiff's range of motion and gait were normal, Plaintiff reported she was almost bedridden by her back pain. (Tr. 390).

After a year, Plaintiff returned to Dr. Berke in March 2010, with continued complaints of daytime sleepiness and back pain. (Tr. 314). On examination, Plaintiff had full muscle strength, normal gait, with the remainder of the exam as normal as the prior. (Tr. 314). Dr. Berke recommended water therapy. (Tr. 315). A subsequent EMG and nerve study also revealed Plaintiff's condition was normal, despite symptoms consistent with degenerative disc disease. (Tr. 318, 336). In August 2010, Plaintiff returned to Dr. Berke for continued back pain and Plaintiff's numerous pain related behaviors were noted. (Tr. 351). Once again, Plaintiff demonstrated full muscle strength and normal gait, with the remainder of the exam as normal as the prior, including a negative straight leg raise. (Tr. 353).

5

Between October 1, 2010 and November 16, 2010, Plaintiff presented to Dr. Felden for another series of epidural injections. (Tr. 371-76). Notes revealed the injections provided excellent relief but pain persisted roughly two weeks after the second injection. (Tr. 371). Plaintiff did have positive straight leg raises and muscle spasms though the lumbar region. (Tr. 371, 374, 376).

In January 2010, Dr. Manos, a state agency consulting physician, reviewed Plaintiff's medical evidence and opined Plaintiff was physically capable of lifting 25 pounds frequently, 50 pounds occasionally, standing about six hours, and sitting about six hours. (Tr. 281-82). Dr. Manos found Plaintiff's complaints of severe pain caused by ADLs and standing for more than ten minutes inconsistent with exam findings of normal strength, gait, and range of motion. (Tr. 281). Nonetheless, Dr. Manos precluded Plaintiff from working on ladders, crouching, kneeling, and crawling as a precaution due to Plaintiff's obesity in combination with her back problems. (Tr. 281).

On January 26, 2011, Plaintiff returned to Dr. Berke with a migraine and lower back pain. (Tr. 380). Plaintiff reported her back pain continued in "intervals", but she mainly presented for headaches, which were chronic low level headaches lasting all day. (Tr. 380). On examination, Plaintiff had full muscle strength, range of motion, and normal gait. (Tr. 380). Dr. Berke recommended a rehabilitation report, which subsequently revealed Plaintiff was, unsurprisingly, normal. (Tr. 385). It was also noted Plaintiff had no frank weakness, but reported being less sturdy while ambulating. (Tr. 384). Plaintiff reported her pain was aggravated while walking, but some relief was provided when she sat down, and epidural injections provided short term relief. (Tr. 384). Again, Plaintiff's lower extremity motor power and range of motion were normal and her gait was reciprocal and nonantalgic. (Tr. 386). Dr. Washington recommended "simple treatment options", including a lumbar flexion program and trunk stabilization exercises. (Tr. 386).

*Plaintiff's Disability Reports and Testimony*

Plaintiff's prior employment included working as a bank teller, tax specialist, and bill collector. (Tr. 176). In a preliminary disability report, Plaintiff claimed she stopped working in 2007 to take care of her newborn, specifically noting it was "not because of her condition." (Tr. 175). However, Plaintiff later testified she stopped working because her back pain was so bad she could not function. (Tr. 34). Plaintiff testified that she could not perform her past jobs because she could not stand for 20 minutes without experiencing excruciating pain. (Tr. 35-36). Plaintiff also stated it was hard for her to perform her daily duties at home, such as grocery shopping or washing clothes, and reported minimal driving. (Tr. 34). When asked about her normal day, Plaintiff testified she woke up at 5:30 a.m. and headed straight to her recliner to ice her back. (Tr. 37). She then woke her three year old daughter and got her ready for school with the help of her 13 year old daughter. (Tr. 37). About 75 percent of the time, Plaintiff's mother took her three year old to school because the commotion caused Plaintiff back pain. (Tr. 37-38). Plaintiff spent the remainder of her mornings with her two year old, the majority of the time in her recliner with her feet up to take pressure off of her back. (Tr. 38). After school, Plaintiff helped her three year old daughter change and prepared a simple lunch. (Tr. 38). Plaintiff testified her mother was at her house the majority of the time helping. (Tr. 39).

Plaintiff reported her pain was somewhat alleviated by medication and changing positions, and she was able to care for her personal needs, but her pain did prevent her from enjoying normal family activities, including outings and walks. (Tr. 182, 208). Plaintiff also reported pain affects her ability to perform light housework and grocery shopping and she enlisted the help of her mother and eldest daughter to help with those tasks. (Tr. 216, 219). In fact, Ms. Hill, Plaintiff's mother, provided

7

a note stating she helps her daughter four to five days per week until Plaintiff's 13 year old daughter is home from school or her husband is home from work. (Tr. 230). Ms. Hill further stated that Plaintiff is not going to get better and will require medication all of her life. (Tr. 231).

Plaintiff reported taking online college courses in accounting. (Tr. 39). At the time of the hearing, Plaintiff was taking four classes. (Tr. 46-47). In addition, Plaintiff had completed three classes in the summer of 2010 and four classes in the fall of 2010. (Tr. 46-47). Plaintiff stated her GPA was 3.7. (Tr. 47). Plaintiff reported having two to four tests per class, per semester and one discussion a week per class. (Tr. 51). Plaintiff stated she could work at her leisure, but she could only work on her lap top for 20 minutes at a time. (Tr. 52).

### VE Testimony

At the hearing, the VE determined Plaintiff's prior jobs as a bill collector and cashier were sedentary positions. (Tr. 56-57). Next, the ALJ posed a number of hypotheticals indicating a person similarly situated to Plaintiff's age, education, employment, and background. In the first hypothetical, the ALJ limited the individual to:

> lifting and carrying [f]ive (sic) pounds frequently and 10 pounds occasionally; [This individual] could sit six hours during the course of an eight-hours day, and stand and/or walk per the course of an eight-hour day. This individual could not climb ladders, ropes or scaffolds, and can occasionally climb stairs and ramps, and knee[l] (sic), crouch, and crawl. This individual should not be exposed to work place hazards such as unprotected heights or dangerous machinery.

(Tr. 58).

In response to the hypothetical, the VE opined the individual could perform Plaintiff's part-time bill collector position at the collection agency. (Tr. 58-59). In addition, the VE testified the individual could perform work as a cashier for a check cashing agency, but per the Dictionary of Occupational Titles, not as performed in Plaintiff's prior work. (Tr. 59). For the second hypothetical, the ALJ

8

created a sit/stand option – "as required for comfort"– permitting the individual to be off task for a minute or two while they change positions. (Tr. 59). In response, the VE opined that such an individual could perform Plaintiff's prior work as a bill collector and work as a cashier according to the DOT. (Tr. 59). For the third hypothetical, the ALJ posed an individual that would be off-task 20 percent of the time. (Tr. 59). The VE responded that an individual off-task 20 percent of the time would not be able to retain employment or perform Plaintiff's prior work. (Tr. 59). Last, the ALJ asked the VE to consider the same individual as the second hypothetical additionally allowing the individual to be absent two days per month due to pain or other symptoms. (Tr. 60). The VE concluded there were no jobs for such an individual. (Tr. 60).

Plaintiff's counsel then asked the VE whether an individual who was off-task 10 percent of the time "because of the need for her to constantly change positions as she was seated" would be able to maintain employment. (Tr. 61). The VE responded, "I think I've already testified to this". (Tr. 61). The ALJ then asked, "I guess the question is, 20 percent of the time there are no jobs. If it was10 percent of the time, would there be no jobs, or how would that affect employability?" (Tr. 61). The VE stated, "I would - - my answer would be the same." (Tr. 61).

***ALJ's Decision***

After careful consideration of the record, including diagnostic findings, clinical findings, and the Plaintiff's subjective complaints of pain, the ALJ concluded Plaintiff had the RFC to perform sedentary work with the following limitations:

> [S]he can never climb ladders, ropes and scaffolds; can only occasionally kneel, crouch, crawl and climb ramps and stairs; cannot be exposed to workplace hazards such as unprotected heights or dangerous machinery; and must be permitted to have a sit stand option as needed for comfort.

(Tr. 13).

9

Next, the ALJ relied upon VE testimony discerning that Plaintiff's ability to perform prior work was not affected by the additional restrictions to Plaintiff's sedentary exertional level. (Tr. 18). Thus, the ALJ concluded Plaintiff was not prevented from performing prior work as a cashier or collector. (Tr. 18).

### Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### Standard for Disability

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**Discussion**

Plaintiff asserts three errors:

1. The ALJ erred by finding Plaintiff not credible;

2. The ALJ erred because the RFC finding was not supported by substantial evidence; and

11

     3.      The ALJ erred in assessing VE testimony.

(Doc. 15, at 1). For the following reasons, Plaintiff's assertions are not well-taken.

***Credibility***

Plaintiff contends the ALJ incorrectly assessed Plaintiff's credibility because Plaintiff's subjective complaints were consistent and fully support that she is disabled.

A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2.  In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992).  Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27

12

(6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

> (i) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

Plaintiff argues that consistency in her testimony, early statements, and reports made to physicians support her allegation that she is disabled. By doing so, Plaintiff suggests her consistent statements regarding subjective pain, without more, renders a finding of disability. Plaintiff glosses over a crucial point. Namely, that credibility is based on consideration of the entire case record and Plaintiff's statements must also be consistent with other evidence in the record. *Rogers*, 486 F.3d at 247-48.  As the ALJ points out, they are not.

The ALJ found Plaintiff suffered from degenerative disc disease and grade II spondylolisthesis in the L5 region. However, despite Plaintiff's allegations of severe pain, the ALJ

13

found Plaintiff's treatment relatively conservative – water therapy, pain medication, physical therapy, weight loss, epidural injections. (Tr. 18, 240, 242, 315, 371, 386). Dr. Weiner suggested she would "probably benefit from surgery" (Tr. 359), which Plaintiff reasonably indicated she would not undergo due to probable complications with a blood disorder. (Tr. 384). However, during Plaintiff's most recent assessment, Dr. Washington recommended "simple treatment options" such as a lumbar flexion program and trunk stabilization exercises. (Tr. 386).

Importantly, the conservative treatment options did alleviate some of Plaintiff's pain. (Tr. 15, 241, 278, 362, 371, 374, 377). Plaintiff reported her symptoms improved and were alleviated with the use of a heating pad (Tr. 241) and ice packs (Tr. 336). In December 2009, Plaintiff reported her pain level was a three on a scale of ten after epidural injections and she was able to be more active, walk, stand, wash dishes, and shop. (Tr. 279). Plaintiff reported she was "actually feeling pretty good" (Tr. 362) and the epidurals "did help her symptoms" (Tr. 362). It was continually noted Plaintiff was a good candidate for and should partake in physical therapy, water therapy, and exercise. (Tr. 240, 242, 315, 336, 386).

The ALJ noted that while Plaintiff's impairments could cause Plaintiff's alleged symptoms, clinical findings throughout the record show Plaintiff was not as functionally limited as she claimed. (Tr. 15-18). Most striking to the Court is pervasive evidence of Plaintiff's normal gait, full muscle strength, and full range of motion. While Plaintiff did testify she used a motorized cart at Wal-Mart at the request of her family (Tr. 48), her gait is consistently documented as normal and Plaintiff admitted she did not use a cane, walker, or wheelchair at any other time (Tr. 15, 242, 250, 260, 314, 336, 352, 364, 366, 380). Treatment notes also document Plaintiff's full muscle strength (Tr. 15, 242, 250, 314, 336, 352, 364, 366, 380), typically normal range of motion (Tr. 15, 242, 336, 362,

364, 366, 385), normal muscle tone (Tr. 242, 314, 352, 380, 385), normal or intact deep tendon reflexes (Tr. 242, 250, 266, 314, 352, 380), coordination (Tr. 242, 250, 352, 380), and negative indication for assistive device (Tr. 334). Treatment notes indicate generally negative straight leg raises (Tr. 278, 352, 364, 366), with the exception of a few positive (Tr. 250, 336).

As the ALJ noted, Plaintiff's testimony regarding her daily activities is not fully consistent with her alleged impairment severity. (Tr. 17). Despite Plaintiff's pain, she was still able to go to the grocery store and perform limited household chores. (Tr. 200, 260). Further, Plaintiff reported no problem living independently. (Tr. 200, 260). After an epidural injection, Plaintiff reported being "able to do more as far as activities, walking, standing, washing dishes, and shopping." (Tr. 278). Dr. Williams noted that "none of [Plaintiff's] symptoms alter her ADLs". (Tr. 241). Plaintiff reported her mother and 13 year old daughter help her out; however, Plaintiff testified she helped her daughter get ready for school by "get[ting her dressed, [and] do[ing] her hair", and when she got home, prepared her a simple lunch. (Tr. 37-38). Plaintiff was also taking four online college courses, which required three to four tests for each class during the semester and one discussion per class each week. (Tr. 45-48, 51). At the time of the hearing, Plaintiff had completed two semesters (Summer 2010, Fall 2010) and maintained a 3.7 GPA. (Tr. 17, 45-47).

Plaintiff's brief assertion that consistency with her mother's statements bolsters her credibility is not persuasive. When assessing Plaintiff's credibility, an ALJ is not required to account for third party statements that largely mirror the Plaintiff's claims. *Cadle v. Astrue*, 2011 WL 3289787, at *4 (N.D. Ohio 2011). Even so, Ms. Hill's claims, while not inconsistent with Plaintiff's claims, are inconsistent with the ALJ's assessment, based on medical evidence in the record, that Plaintiff's functioning limitations are not as severe as Plaintiff alleges.

15

Regardless of whether they are internally consistent, Plaintiff's allegations of pain and functional limitations are not consistent with objective medical evidence in the record. On review, the Court must look to whether the ALJ's credibility finding was specifically clear and supported by evidence in the record. It is. Even Plaintiff admits the ALJ "explain[ed] [] the diagnostic findings, clinical findings, [and] opinions contained in the record" to determine Plaintiff was not credible. (Doc. 15, at 19). By doing so, Plaintiff points out that the ALJ's credibility finding was supported by substantial evidence as explained above.

### RFC Finding

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. An ALJ must also consider and weigh medical opinions. *Id.* § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *1.

After consideration of the entire record, the ALJ found Plaintiff had the RFC to:

> perform sedentary work . . . except she can never climb ladders, ropes, and scaffolds; can only occasionally kneel, crouch, crawl, and climb ramps and stairs; cannot be exposed to workplace hazards such as unprotected heights or dangerous machinery; and must be permitted to have a sit stand option as needed for comfort.

(Tr. 13).

Plaintiff argues that there is no logical connection between the RFC and the evidence in the record. Specifically, Plaintiff argues the ALJ erred by including additional limitations for the Plaintiff within the RFC than provided by Dr. Manos, a state agency physician. The ALJ found Dr.

16

Manos provided exertional limits comparable to medium work. (Tr. 17, 281). After taking into account Plaintiff's allegations of pain, the ALJ opined Plaintiff only had the ability to perform a reduced range of sedentary work, which included a restriction allowing Plaintiff to sit, stand, and change positions as needed for comfort. (Tr. 13). The ALJ was certainly permitted to find a reduced exertional capacity after assessing the entire record. Importantly, it shows the ALJ considered Plaintiff's allegations of pain by providing a restriction to accommodate it. The ALJ was not required to adopt a medical opinion verbatim and was justified in providing Plaintiff with an exertional limit that better suited her complaints. 20 C.F.R. §§ 404.1567(c), 416 967(c) ("If someone can do medium work, we determine that he or she can also do sedentary . . . work").

In addition, the ALJ adopted the exact postural limitations noted in Dr. Manos's opinion, providing a rational connection. As Defendant points out, both the ALJ and Dr. Manos found Plaintiff could never climb ladders, ropes, or scaffolds and only occasionally kneel, crouch, or crawl. (Tr. 13, 282). These exertional limits within the RFC provided by the ALJ are supported by substantial evidence and are rationally connected to his finding.

Plaintiff also argues the ALJ erred in his RFC assessment because he found Plaintiff's statements were not credible. This argument is circular. As noted above, the ALJ was justified in determining Plaintiff was not credible. Relevant to his RFC finding, the ALJ was required to make a finding regarding the credibility of Plaintiff's statements based on a consideration of the entire record, which the ALJ did. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *See* (SSR) 96-7p, 1996 WL 374186, *1. The ALJ discussed the objective medical evidence at length, further including a limitation directly correlating to Plaintiff's complaints of pain. Substantial evidence, as noted above, supports this.

17

Next, Plaintiff argues the ALJ erred by finding Plaintiff capable of performing ADLs. (Doc. 15, at 16). The record reflects Plaintiff was capable of the following: grocery shopping, washing dishes, limited cooking and driving, climbing stairs, lifting her children, dressing her daughter for school, and doing her hair. (Tr. 37, 38, 241, 260, 278). In addition, Plaintiff was capable of taking online college courses, participating in class discussions, and taking multiple tests, while maintaining a commendable 3.7 GPA. (Tr. 39, 46-47, 51-52). Despite Plaintiff's complaints of pain, she maintained a normal gait, full muscle strength, and typically full range of motion. (Tr. 15, 242, 250, 260, 314, 336, 352, 364, 366, 380). Accordingly, the ALJ's assessment of Plaintiff's ADLs is supported by substantial evidence.

Plaintiff argues the ALJ's RFC assessment was incorrect because the "ALJ's poor reasoning for rejecting Ms. Hill's statement lacks a coherent foundation to a legally sufficient process." (Doc. 15, at 15). Ms. Hill qualifies as an "non-medical source" under the regulations. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). SSR 06-03p provides, in pertinent part, that an ALJ may reject a non-medical source opinion on the basis of consistency with other evidence, the nature of the relationship with the claimant, and any factor that tends to support or refute the opinion. 2006 WL 2329939, at *6. The ALJ rejected Ms. Hill's opinion because "her statement did not establish that the claimant is disabled[]" and she could not be considered a disinterested third party because she is Plaintiff's mother. (Tr. 17). As indicated in SSR 06-03p, these reasons are legally sufficient and the ALJ did not err in rejecting Ms. Hill's opinion.

Next, Plaintiff argues the ALJ erred because he did not consult a medical expert after deviating from "all medical evidence in coming to her conclusion."  (Doc. 15, at 17). The ALJ did not deviate from the medical evidence. Rather, the ALJ adjusted exertional levels after considering

18

the record as a whole, specifically incorporating limitations to accommodate Plaintiff's complaints of pain. (Tr.  13). More importantly, the ALJ was not required to solicit medical expert testimony; rather, it is discretionary. 20 C.F.R. § 404.1527(e)(2)(iii). As Defendant points out, the medical evidence in this case was not highly technical medical data that required medical expertise. The medical evidence is plain, consistent, coherent, and repeatedly reflects Plaintiff's normal gait, full strength, and full range of motion.  (Tr. 15, 242, 250, 314, 336, 352, 360, 364, 366, 380). The ALJ's decision to not solicit a medical expert is legally justified.

Last, Plaintiff briefly asserts the ALJ erred because he did not assign appropriate weight to Plaintiff's treating physician, Dr. Penvose. Specifically, Plaintiff argues the ALJ erred in his RFC assessment because he did not mention Dr. Penvose's statements that Plaintiff "can't stand for long periods of time" and has "problems with ADLs - caring for her children". (Tr. 267). An ALJ's failure to mention a physician's opinion does not constitute a reversible error where the ALJ does not reject the restriction in question. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001). Dr. Penvose's restriction was not rejected. Rather, the ALJ incorporated Dr. Penvose's restriction in the  RFC by providing a stand/sit comfort limitation. (Tr. 13). Plaintiff also briefly asserts the ALJ failed to reference Dr. Weiner's opinion; however, the ALJ did reference this opinion. Dr. Weiner stated Plaintiff "failed therapy and epidurals", which the ALJ quoted word for word in her decision. (*See* Tr. 15, 359).

The ALJ's RFC was supported by substantial evidence. As the Defendant points out, the record repeatedly shows minimal functional consequences resulting from Plaintiff's impairments. Treatment notes frequently documented normal gait (Tr. 15, 242, 250, 314, 352, 364, 366, 380, 386), normal range of motion (Tr. 15, 242, 336, 362, 364, 366, 385), full muscle strength (Tr. 15, 242,

19

250, 314, 336, 352, 364, 366, 380),  normal muscle tone (Tr. 242, 314, 352, 380, 385), normal or intact deep tendon reflexes (Tr. 242, 250, 266, 314, 352, 380), and coordination (Tr. 242, 250, 352, 380).

### *VE Testimony*

Plaintiff asserts the ALJ erred by relying on the VE's opinion that Plaintiff could perform prior work with a sit/stand option because the VE allegedly clarified that the sit/stand option was the same as being 10 percent off-task, which in turn renders her disabled. This is simply not the case.

The VE opined an individual could perform Plaintiff's prior work as a bill collector with "a sit stand option, as required for comfort", also permitting the individual to be off-task for "a minute or two" while changing positions. (Tr. 59).

Plaintiff's counsel then asked the VE whether an individual who was off-task more than 10 percent of the time "because of the need for her to constantly change positions" would be able to maintain employment. (Tr. 61). The VE responded, that such a person would not be able to be employed.  (Tr. 61).   The ALJ then asked, "I guess the question is, 20 percent of the time there are no jobs. If it was 10 percent of the time, would there be no jobs, or how would that affect employability?" (Tr. 61). The VE stated, "I would - - my answer would be the same." (Tr. 61).

A plain reading of the VE testimony reveals that the VE accounted for a sit/stand option, allowing time for an individual to change positions, thus being off task for "a minute or two", but that either 10 or 20 percent of the time being off task would preclude employment.

Plaintiff asserts that the position changes must amount to being off task at least 10 percent of the time, but there is no basis for that.  "A minute or two" to change positions for comfort, once in a while, does not equate to a finding that Plaintiff would need to be off task for 10 percent (or

more) of the time.

Plaintiff asks this Court to find the VE's testimony was "vague" and the "required for comfort" language needs to be clearly defined, thus requiring remand. As noted above, the undersigned finds that the VE's testimony was not vague. Rather, the ALJ posed clear hypotheticals and the VE gave clear responses. Further, the ALJ properly relied on the VE testimony that Plaintiff could perform past relevant work as a bill collector with a sit stand option. The ALJ did not err because the hypothetical questions accurately reflected Plaintiff's RFC, explained above, and the ALJ properly relied on VE testimony. The VE was clearly using common sense and experience to differentiate between the amount of time needed to incorporate a sit-stand option for comfort and being off task for 10 percent (or more) of the time.

### Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

  s/James R. Knepp II
  United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).